*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1115**

State of Minnesota,
Respondent,

vs.

Ashad Jemeir Mayo,
Appellant.

**Filed June 15, 2015
Affirmed
Connolly, Judge**

Hennepin County District Court
File No. 27-CR-13-31042

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Kelly O'Neill Moller, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Suzanne M. Senecal-Hill, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Connolly, Presiding Judge; Worke, Judge; and Chutich, Judge.

UNPUBLISHED OPINION

**CONNOLLY**, Judge

Appellant challenges his conviction of first-degree aggravated robbery. He argues that the district court erred in denying (1) his motion to suppress evidence of $130 in cash an officer found in appellant's pocket because it was speculative to conclude that the officer would have inevitably found the cash during a search incident to arrest for appellant's outstanding warrant and (2) his motion to suppress the victim's show-up identification because the show-up procedure was highly suggestive and substantially likely to result in misidentification. Because we conclude that the cash would inevitably have been discovered during a search of appellant and that the show-up procedure was not defective, we affirm.

## FACTS

Around 4:30 a.m. on September 20, 2013, T.S. called 911 from a gas station to say that he had just been robbed at the corner of Lake Street and Harriet Avenue, Minneapolis, by two men he described as black, having medium builds, and riding bicycles. He reported that the younger of the two men was in his early 20's and about 5'6" or 5'7" tall, had a handgun with an extended barrel, and rode a dirt bike; the older man was in his 30's, about 6'0" to 6'1" tall, and rode a yellow, 10-speed bicycle.

One block south and five blocks east of the site of the robbery, at 31st Street and Nicollet Avenue, an officer working in the fifth precinct heard the dispatch report. The officer looked out the window and saw two black men, one on a yellow 10-speed bicycle and the other on a smaller, BMX-style bicycle, riding east on 31st Street; no one else was

on the street. The officer reported the men's location and watched them ride east on 31st Street until they went under the 35W bridge.

Two officers in a squad car near the precinct drove to 31st and Clinton, two blocks east of the 35W bridge, where they saw appellant riding east on a yellow, 10-speed bicycle. No one else was on the street.[1] The officers drove in front of him, ordered him to the ground, and conducted a thorough search because T.S. had reported that one of the robbers had a gun. The officer felt a bulge in appellant's pants pocket, reached inside the pocket, and pulled out $130. When appellant was told the police were investigating a possible robbery, he said he was not involved. The officers ran appellant's name in their computer and discovered an outstanding warrant on him.

Meanwhile, another officer went to the gas station to speak to T.S., who told him that the men who robbed him had fled south down an alley between Harriet Avenue and Grand Avenue. T.S. got into the officer's squad car; they drove through the alley to search for T.S.'s property. The officer heard that a possible suspect was now at Park Avenue and 31st Street and told T.S. the police wanted him to look at "a possible person involved in the robbery." T.S. said he could identify the men who had robbed him. The officer did not tell T.S. that they had a suspect in custody.

When T.S. arrived, the officer with him parked so the lights of his squad car shone on the car in which appellant was sitting. Appellant, who was handcuffed, was then removed from the car and stood outside for about 30 seconds, illuminated by the squad

---

[1] The other suspect was seen by a different officer and chased on foot, but not caught. An abandoned BMX bike was found in the area of the chase.

3

car's lights and overhead street lights. T.S. told the officer with him that appellant "was the guy that was involved in the armed robbery that was . . . riding the yellow 10-speed bike." The officer said that T.S. seemed sure about the identification. About 25 or 30 minutes passed between the robbery and T.S.'s identification of appellant.

Appellant was charged with and convicted of first-degree aggravated robbery. He challenges his conviction, arguing that his motions to suppress the cash taken from him and the victim's identification of him should have been granted.

## D E C I S I O N

**1.     The motion to suppress the cash**

"When reviewing a district court's pretrial order on a motion to suppress evidence, we review the district court's factual findings under a clearly erroneous standard and the district court's legal determinations de novo." *State v. Gauster*, 752 N.W.2d 496, 502 (Minn. 2008) (quotation omitted).

The district court concluded that, although the cash was illegally seized from appellant's pocket, it was admissible because it would have been discovered inevitably.[2]

> 5.      Illegally seized evidence is nonetheless admissible if the State can establish by a preponderance of the evidence that the fruits of the challenged search ultimately or inevitably would have been discovered by lawful means. The inevitable discovery doctrine is closely related to the independent source doctrine, which will countenance introduction of otherwise illegally-seized evidence if the police could have retrieved it

---

[2] The district court also concluded that the cash was admissible because the officer had probable cause to arrest appellant, and appellant challenges this conclusion. Because we affirm the admission of the cash on the ground of inevitable discovery, we do not address the probable-cause argument.

4

> on the basis of information obtained independent of their illegal activity.
>
> 6.          Here, [the o]fficer . . . conducted a lawful pat down search as the reported crime was a robbery with a weapon. While the cash in [appellant's] pocket was not obvious contraband, [he] would have been identified by [the] officer . . . and [his] outstanding DOC warrant would have led to his arrest, and [he] would have been searched incident to his arrest [when] the cash would have been inevitably discovered as the result of a lawful search incident to a lawful arrest.

(Quotations and citations omitted).  We agree.

Appellant challenges this conclusion, arguing that, when the cash was discovered, the officer had not yet learned of appellant's outstanding warrant and would not have learned of it if he had not illegally found the cash first.  But "in the course of a *Terry*-type stop, . . . [s]ometimes the officer [investigating] will communicate with others, either police or private citizens, in an effort . . . to confirm the identification or determine whether a person of that identity is otherwise wanted."  *Michigan v. Summers*, 452 U.S. 692, 700, 101 S. Ct. 2857, 2593 n.12 (1981).

The officer stopped appellant because his appearance matched the description of one of the robbers and he was riding a bicycle that matched the description of one of the bicycles in the vicinity of the robbery shortly after the robbery.  The officer testified that, knowing the robbery had involved a gun, he wanted to be "a little more thorough [in his pat search] before [he] put [appellant] in the squad [car]."  But, regardless of what the search produced, the officer would have asked appellant his name and run the name through the police computer, thus revealing the warrant; appellant would have been arrested, *see State v. Robb*, 605 N.W.2d 96, 101 n.2 (Minn. 2000) (once a warrant is

discovered, officers must make an arrest); a search would have been performed incident to the arrest, *see State v. Ortega*, 770 N.W.2d 145, 149-50 (Minn. 2009) (listing search incident to a lawful arrest as one of the exceptions to the warrant requirement); and the cash would have been discovered.

## 2. The identification

In reviewing whether a defendant has been denied due process by an identification procedure, this court independently reviews the facts and determines, as a matter of law, whether suppression was warranted. *State v. Taylor*, 594 N.W.2d 158, 161 (Minn. 1999).

A two-part test determines whether a pretrial identification is admissible evidence. The first question is "whether the procedure was unnecessarily suggestive," which includes "whether the defendant was *unfairly* singled out for identification," and ultimately asks "whether the procedure used by the police influenced the witness'[s] identification of the defendant." *Id*. (quotations and citations omitted). T.S., having been told that he would be shown "a possible person involved in the robbery," saw appellant, in handcuffs, taken from a squad car by an officer. "In dictum, the supreme court in *Taylor* stated that a one-person show-up is unnecessarily suggestive if the police single out a suspect from the general population based on a victim's description and present the suspect in handcuffs to the victim for identification. *Taylor*, 594 N.W.2d at 162." *State v. Anderson*, 657 N.W.2d 846, 851 (Minn. App. 2002). Arguably, appellant was not singled out from the general population because no one else was in the area at the time.[3]

---

[3] Appellant argues that, because Minneapolis contains many people who match T.S.'s description of him and many bicycles that match the description of his bicycle, he could

6

But "[a]n unnecessarily suggestive identification procedure does not preclude admission of the identification testimony unless there is a substantial likelihood of irreparable misidentification." *Id*. The second question is "whether the identification created a very substantial likelihood of irreparable misidentification" and involves a consideration of the "totality of the circumstances." *Taylor*, 594 N.W.2d at 161 (quotations and citations omitted).

Five factors are relevant to whether an "irreparable misidentification" was likely to have occurred: (1) the witness's opportunity to see the suspect when the crime occurred; (2) the witness's degree of attention to the suspect; (3) the witness's ability to describe the suspect accurately; (4) the witness's certainty about the identification when confronted with the suspect; and (5) the amount of time between the crime and the confrontation. *State v. Adkins*, 706 N.W.2d 59, 62-63 (Minn. App. 2005). T.S. saw appellant clearly during the crime; T.S. paid attention to appellant's age, his height, and the type of bicycle he was riding; T.S. could describe both appellant and the bicycle accurately; T.S. was certain about appellant's identity as one of the robbers; and the confrontation occurred only about 30 minutes after the robbery. No irreparable misidentification of appellant is likely to have occurred.

Appellant relies on *In re Welfare of M.E.M*., 674 N.W.2d 208, 215 (Minn. App. 2004) (concluding that the admission of evidence on the defendant's identification was not clearly erroneous, although the defendant was "singled out" for presentation to the

_____

have been misidentified, but he does not address the fact that no other persons or bicycles of any description were seen near the time and place of the robbery.

victim), to argue that he was unfairly singled out for identification. But *M.E.M.* is distinguishable: in that case, the victim did not see the robbers' faces during the crime, saw them only when they fled, and could describe them only by what they were wearing, a yellow jersey and a gray sweatshirt. *Id.* at 211. When the defendant was shown to her, she could identify him by his jersey as one of the men she saw running from the scene, but could not identify him in court. *Id.* at 212. Two witnesses, who had passed a man wearing that jersey on the street shortly before the robbery, corroborated the victim's identification of the defendant as the wearer of the jersey. *Id.* at 215. Here, the victim saw the robbers clearly during the crime and was able to identify appellant as one of them; he was also able to identify appellant in court.

Even if appellant was unfairly singled out for identification, a consideration of the five factors indicates that no misidentification would have occurred. There was no basis to suppress the evidence of T.S.'s identification of appellant.

**Affirmed.**